## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:04cv1184 |
| ) | **Electronic Filing** |
| **ANTON GEISER,** ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION

September 29, 2006

## I.    INTRODUCTION

Plaintiff, the United States of America (the "Government"), filed this action to revoke the naturalized citizenship of Defendant, Anton Geiser ("Geiser"), pursuant to Section 340(a) of the Immigration and Nationality Act of 1952, as amended, ("INA"), 8 U.S.C. § 1451(a). The Government charges that Geiser procured American citizenship illegally by obtaining an immigration visa to which he was not entitled. Such lack of entitlement to enter the United States stemmed from his alleged service as a guard at Nazi concentration camps in Germany from 1943 to 1945. Geiser's naturalization was premised on his 1956 entry into the United States under the Refugee Relief Act of 1953 (the "RRA"), Pub. L. No. 83-203, 67 Stat. 400 (amended 1954). The parties have filed cross motions for summary judgment, and the matter is now before the Court.

## II.    STATEMENT OF THE CASE

Geiser was born on October 17, 1924, in Djak-Selci, Yugoslavia. Geiser's Concise Statement of Material Facts ("Geiser's CSMF") ¶ 1.  Geiser worked on his family's farm in Yugoslavia until 1942, when he and his father received letters from the German government directing them to report to Satnica, Yugoslavia for a military physical. Geiser's CSMF ¶¶ 3 & 6.  Geiser entered the Nazi Waffen SS on or around September 14, 1942. Geiser's CSMF ¶ 7.

Certain units of the Waffen SS, known as the SS Death's Head battalions, were used to guard Nazi concentration camps. Government's Concise Statement of Material Facts ("Government's CSMF") ¶ 15.

In January of 1943, Geiser was transferred to the SS Death's Head battalion at Sachsenhausen Concentration Camp in Oranienberg, Germany, where he served as a guard. Geiser's CSMF ¶¶ 12 & 13; Government's CSMF ¶ 48. As an armed guard at Sachsenhausen, Geiser rotated through duties such as guarding the perimeter, escorting prisoners to work sites, and standing guard in the camp's guard towers. Geiser's CSMF ¶ 14; Government's CSMF ¶¶ 53 & 54.

In November of 1943, Geiser and twelve (12) other SS guards were ordered to Buchenwald Concentration Camp to transport prisoner from Buchenwald to Arolsen, a subcamp of Buchenwald. Geiser's CSMF ¶ 16; Government's CSMF ¶ 94. At Arolsen, Geiser was an armed guard with duties that included guarding the camp's perimeter and escorting prisoners to and from work sites. Geiser's CSMF ¶ 18; Government's CSMF ¶¶ 96 & 97. At the end of March of 1945, as the Allied forces were closing in on Arolsen, Geiser and the other guards were ordered to evacuate the prisoners from Arolsen to Buchenwald. Geiser's CSMF ¶ 18; Government's CSMF ¶¶ 96 & 97. Geiser returned to Buchenwald, but quickly left the camp as Allied forces advanced toward Buchenwald. Geiser's CSMF ¶ 24.

Geiser traveled on foot to Volkmarsen, Germany, where he remained until 1948. Geiser's CSMF ¶ 27. In the fall of 1948, Geiser moved to Voecklabruck, Austria, to live with his future wife. Geiser's CSMF ¶ 28. In August 1956, in Salzburg, Austria, Geiser applied for an immigration visa to enter the United States under the Refugee Relief Act of 1953, Pub. L. No. 203, 67 Stat. 400 (amended 1954)("RRA"). Government's CSMF ¶ 112. The application lists his name as "Anton Geisser." *Id.* An immigrant visa was issued to Geiser on August 23, 1956. Government's CSMF ¶ 113. Geiser then entered the United States on or about October 28,1956. Geiser's CSMF ¶ 34; Government's CSMF ¶ 114.

2

On October 14, 1961, Geiser filed an application for naturalization as a United States citizen under the name "Anton Geisser." Government's CSMF ¶ 115.  Geiser filed a petition for naturalization with the Court of Common Pleas of Mercer County, Pennsylvania on January 23, 1962.  Government's CSMF ¶ 116.  In the petition, Geiser requested that his name be changed from "Anton Geisser" to "Anton Geiser." *Id.*  Geisser was naturalized by the court on March 27, 1962, and received Certificate of Naturalization No. 8058860. Geiser's CSMF ¶ 35; Government's CSMF ¶ 117.

By performing his duties as a guard, the Government contends that Defendant personally assisted the Nazi Government in persecuting persons because of race, religion or national origin.  Geiser's service as an armed guard at the concentration camps rendered him ineligible for the immigration visa, and his entry into the United States was illegal.  Therefore, the Government argues that Geiser's naturalization was unlawful, and his citizenship must be revoked.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P 56(c), summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law.  To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*.  The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well.  *Whiteland Woods, L.P. v. Township of West Whiteland,*

193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

The Government, however, "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Fedorenko v. United States*, 449 U.S. 490, 505 (1981) (quoting *Costello v. United States*, 365 U.S. 265, 269 (1961)); *see also United States v. Szehinskyj*, 277 F.3d 331, 336 (3d Cir. 2002). The evidence for revocation must be "clear, unequivocal, and convincing" and not leave "the issue in doubt." *Fedorenko v. United States*, 449 U.S. at 505 (quoting *Schneiderman v. United States*, 320 U.S. 118, 125 (1943)).

## IV.   DISCUSSION

A condition precedent to lawful naturalization is that the would-be citizen resided continuously in this country for at least five years after having been "lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1427(a)(1). To be lawful, admission to the United States must have been undertaken pursuant to a valid immigration visa. See *Fedorenko*

*v. United States*, 449 U.S. at 515; *United States v. Koreh*, 59 F.3d 431, 438 (3d Cir. 1995).

The INA imposes upon the government the duty to bring a civil action against a naturalized citizen "for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). Denaturalization, therefore, is mandated for a person whose citizenship was obtained by unlawful means. *See Fedorenko v. United States*, 449 U.S. at 517 ("Once a district court determines that the Government has met its burden of proving that a naturalized citizen obtained his citizenship illegally ... it has no discretion to excuse the conduct."); *United States v. Koreh*, 59 F.3d at 438. Geiser was admitted for permanent residence based on a visa issued under the RRA. To ascertain whether Geiser "illegally procured" his order and certificate of naturalization, we must evaluate the validity of his visa.

After World War II, the United States provided for expedited immigration under the Displaced Persons Act of 1948 ("DPA"), Pub. L. No. 80-774, Ch. 647, 62 Stat. 1009, amended by Pub. L. No. 81-555, Ch. 262, 64 Stat. 219 (1950). One of the restrictions under the DPA, however, was that "no visas shall be issued under the provisions of this Act . . . to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin[1]." Pub. L. No. 81-555, Ch. 262, 64 Stat. 219, § 13; *See also Fedorenko v. United States*, 449 U.S. at 510. In 1953, Congress passed the RRA, the Act under which Geiser obtained his visa. Similar to the DPA, Section 14(a) of the RRA provides: "No visa shall be issued under

---

[1]    In *Szehinskyj*, the Third Circuit made explicit that the assistance in persecution ground for visa ineligibility was an independent ground that did not include a fraud element. *United States v. Szehinskyj*, 277 F.3d 331, 334 (3d Cir. 2002).  Therefore, once a determination of ineligibility is made on this ground, there is no need to look for and find a material misrepresentation. *Id.*; *United States v. Tittjung*, 235 F.3d 330, 341 (7th Cir. 2000); *cf. United States v. Breyer*, 41 F.3d 884, 889-891 (3d Cir. 1994)(finding ineligibility without examining whether any misrepresentation occurred); *Koreh*, 59 F.3d at 438-42 (same).

this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin." Pub. L. No. 83-203 § 14(a), 67 Stat. 400.   The RRA added the word "personally," thus narrowing the class of potential immigrants who could be excluded based on their assistance in persecution.  *See United States v. Friedrich*, 402 F.3d 842, 845 (8th Cir. 2005) (citing *United States v. Lileikis*, 929 F. Supp. 31, 38-39 (D. Mass. 1996)).  Thus, Geiser was not eligible for his visa if, prior to obtaining the visa, he had personally advocated or assisted in persecution based on race, religion, or national origin.

Geiser, however, argues that the Third Circuit's decision in *Chen v. Ashcroft*, 381 F.3d 221 (3d Cir. 2004), establishes that the term "persecution" as used in the RRA is ambiguous. Therefore, under the administrative law principles announced by the Supreme Court in *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984), this Court is required to defer to the State Department's alleged policy of granting RRA visas to former concentration camp guards who were not war criminals.  For the reasons set forth below, the Court finds that neither *Chen* nor *Chevron* are applicable to the instant action.

An administrative policy must be given deference under *Chevron* when:

> "it appears that Congress delegated authority to the agency generally to make  rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27, 150 L. Ed. 2d 292, 121 S. Ct. 2164 (2001). If *Chevron* applies, a court must ask (at what is customarily called step one) "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If so, courts, as well as the agency, 'must give effect to the unambiguously expressed intent of Congress.'" *Household Credit Servs, Inc. v. Pfennig*, 541 U.S. 232, 158 L. Ed. 2d 450, 124 S. Ct. 1741, 1747 (2004) (quoting *Chevron*, 467 U.S. at 842-43). "However, whenever Congress has 'explicitly left a gap for the agency to fill,'" a court must proceed to step two, and "the agency's [interpretation] is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* (second brackets in original) (quoting Chevron, 467 U.S. at 843-44). The Court has described this test as one of reasonableness. *See Chevron*, 467 U.S. at 845, 865, 866.

*Chen v. Ashcroft*, 381 F.3d at 223-224.  In *Chen*, the court was called upon to review an order of the Board of Immigration Appeals (BIA) affirming the denial of plaintiff's application for asylum under 8 U.S.C. § 1101(a)(42) based on the forced abortion of plaintiff's fiance by Chinese officials. *Id.* at 222. Plaintiff did not contend that 8 U.S.C. § 1101(a)(42) unambiguously covered the unmarried partners of persons who have undergone forced abortions or sterilization, but instead focused on step two of the *Chevron* analysis and argued that it was irrational for the BIA to apply the statute to permit asylum for spouses of victims of forced abortions but not for unmarried partners of such victims. *Id.* at 224.

In finding that the BIA acted reasonably, the court stated:

> with the exception of forced abortions and sterilizations, the concept of "persecution" is left completely undefined. We infer from Congress's use of this ambiguous term an intent to delegate interpretive authority to the agency, including the ability to decide, within a reasonable range, the precise contours of its meaning.

*Id.* at 232.  This was not a determination that "persecution" was ambiguous as it applied to the intense suffering by one spouse resulting from a forced abortion or sterilization of the other spouse. The court merely made an inference from the use of the term in determining whether Congress' intent in amending § 1101(a)(42) was to afford relief to every person who was a victim of any rule or practice that was part of the Chinese population control program.  *Id.*  As such, the inference has no application in this instance.

More applicable to the instant case, is the Third Circuit's ruling in  *Szehinskyj v. AG of the United States*, 432 F.3d 253 (3d Cir. 2005).  There, the issue before the court was whether the statutory language "assisted in persecution" meant the same thing in the Displaced Persons Act of 1948 and the Holtzman Amendment of 1978[2].  *Szehinskyj v. AG of the United States*,

---

[2]     The Holtzman Amendment, Pub. L. No. 95-549, 92 Stat. 2065 (1978), provides for the exclusion and removal of any alien "who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with [Nazi Germany or its allies] ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion. . . ." 8 U.S.C. § 1182(a)(3)(E).

432 F.3d at 254.  In this case, the Government had charged that Szehinskyj had been a prison guard at several concentration camps and a member of the Waffen SS, a special army unit in charge of the concentration camps. The district court found that: (1) Szehinskyj had been a concentration camp guard and an SS member: (2) had assisted in persecution; and (3) he was ineligible for entry under the DPA.  *United States v. Szehinskyj*, 104 F. Supp. 2d 480, 499 (E.D. Pa. 2000).  After Szehinskyj had exhausted his appeals, *see United States v. Szehinskyj*, 277 F.3d 331 (3d Cir. 2002), the Government instituted removal proceedings under the Holtzman Amendment. *Szehinskyj v. AG of the United States*, 432 F.3d at 254.

In rejecting Szehinskyj's argument that Congress's intent was that only "war criminals" would be covered by the statutory language, and not - the words of the text notwithstanding - all those who assisted in Nazi persecution, the court made the specific finding that "the statutory language [was] not ambiguous." *Szehinskyj v. AG of the United States*, 432 F.3d at 256. The relevant language at issue, "assisted in persecution," was precisely the same in the Holtzman Amendment as in the provision of the DPA at issue in Szehinskyj's denaturalization trial.

The RRA was passed by Congress in 1953, and in pertinent part, provides:

> No visa shall be issued under this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin.

Pub. L. No. 83-203 § 14(a), 67 Stat. 400.  The DPA and the RRA are parallel statutes. Congress added the word "personally" to the RRA in order to narrow the class of potential immigrants who could be excluded based on their "assistance in persecution" rather than on the mere membership in an organization.  *See United States v. Friedrich*, 402 F.3d 842, 845 (8th Cir. 2005) (citing *United States v. Lileikis*, 929 F. Supp. 31, 38-39 (D. Mass. 1996)). The terms "assisted in persecution" as used in the DPA, RRA and Holtzman Amendment have the same meaning and are not ambiguous. Therefore, Geiser's contention that the Third Circuit has already made a determination regarding the ambiguity of the term "persecution" as used in the

8

RRA is without merit.

Further, Geiser is unable to direct this Court to even one application of *Chevron* to a denaturalization of a person whose visa was found to have been invalid when issued under either the DPA or the RRA. Such application has been specifically rejected, however, by the Courts of Appeals for both the Seventh Circuit and the Eighth Circuit. In finding that a concentration camp guard  personally assisted in the persecution that occurred in those camps and was thus ineligible for a visa under the RRA, the Seventh Circuit specifically stated "[t]he statute is not ambiguous, and therefore we do not need to address the agency's construction of the statute [pursuant to *Chevron*]." *United States v. Kumpf*, 438 F.3d 785, 790 (7th Cir. 2006).

In *United States v. Friedrich*, 402 F.3d 842 (8th Cir. 2005), a denaturalization action involving a concentration camp guard who obtained a visa under the RRA, the defendant argued that the court was required to provide deference to the 1955 State Department decision to grant him a visa under *Chevron*. *United States v. Friedrich*, 402 F.3d at 846. In rejecting defendant's argument the court stated:

> Under *Chevron*, we must first consider whether Congress has directly spoken to the precise question at issue. Because we have concluded that Congress intended the RRA to prohibit the State Department from granting a visa to an armed Death's Head concentration camp guard, the *ultra vires* agency decision to grant Friedrich a visa is due no deference.

*United States v. Friedrich*, 402 F.3d 846 n.5.

Similarly, this Court finds that the relevant language of the RRA at issue here is not ambiguous, and no deference will be given to the State Department's decisions to grant visas to former concentration camp guards. Therefore, the Court does not reach Geiser's contention that the State Department had in fact adopted a policy of granting RRA visas to former Nazi concentration camp guards who were not war criminals.

Geiser also makes a vague reference to consideration by the State Department of whether a guard's service was voluntary or involuntary in evaluating their admissibility into the United States. The Refugee Relief Act, however, does not require a person to assist voluntarily

in persecution. In the context of the DPA, courts have held that the voluntariness of the service is irrelevant. *Fedorenko v. United States*, 449 U.S. at 513 ("an individual's service as a concentration camp armed guard -- whether voluntary or involuntary -- made him ineligible for a visa."); *United States v. Wittje*, 422 F.3d 479, 489 (7th Cir. 2005) ("there is no voluntariness requirement in the plain language" of the Displaced Persons Act).  Similarly, the plain language of the Refugee Relief Act does not provide for a consideration of voluntariness in assessing whether an individual personally assisted in persecution. *See United States v. Kumpf*, 438 F.3d at 790-791.

The sole remaining issue is whether Geiser's particular actions as a guard constituted "personal" assistance in persecution under the RRA. In *Fedorenko*, the Supreme Court described conduct that would satisfy the broader "assisting in persecution" under the DPA stating:

> an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

*Fedorenko v. United States*, 449 U.S. at 512 n.34. Thus, an armed guard who took direct action against prisoners unquestionably assisted in persecution. It is undisputed that persecution occurred at the locations where Geiser served.

The parameters of the RRA are not limited to personal affirmative acts causing harm to individuals. The language of the RRA instead addresses personal assistance. *United States v. Kumpf*, 438 F.3d at 790.  Here, Geiser was a guard who was issued a uniform, armed with a rifle, received  wages, and took leave to visit home. He admits to standing guard over prisoners at Sachsenhausen, Buchenwald and Arolsen. He also admits to receiving orders to shoot

escaping prisoners, although he never did so. Nevertheless, his personal presence as an armed guard clearly assisted in the persecution of the prisoners. As the Eighth Circuit explained, "the pertinent question is [] whether Friedrich 'personally assisted' on persecution, not whether he engaged in direct persecution." *See United States v. Friedrich*, 402 F.3d at 845. The court further concluded that "by guarding the perimeter of the [] concentration camps to ensure that prisoners did not escape from these unspeakable conditions, Friedrich personally assisted in the persecution that occurred in those camps." *Id.* at 846.

The facts of *Friedrich* are very similar to those in Geiser's case. Friedrich, an ethnic German born in Romania, joined the Waffen SS in October 1942. *United States v. Friedrich*, 305 F. Supp. 2d 1101, 1103 (E.D. Mo. 2004). After completing basic training, Friedrich was assigned to the Death's Head unit at the Gross-Rosen concentration camp, and later was assigned to the Dyhenfurth concentration camp. *Id.* Friedrich's duties as a Death's Head guard were to guard the perimeter of the camp, escort work-details to forced labor sites and guard the prisoners while they worked, and to escort prisoners from one concentration camp to another. *Id.* Like Geiser, Friedrich was under orders to shoot any prisoners who attempted to escape. *Id.* After Allied troops overtook the German forces, Friedrich lived in Austria for several years, and eventually applied for a visa to the United States. *Id.* His visa application stated that he was in the German Army from 1942 to 1945, but made no mention of his Waffen SS service or of his duties as a concentration camp guard. *Id.* Friedrich was granted a visa under the RRA, entered the United States, and was eventually naturalized on May 4, 1962. *Id.* After learning of Friedrich's involvement with the SS, the United States sought to revoke his citizenship under the INA. In granting summary judgment to the Government and revoking Friedrich's citizenship, the district court concluded: "Friedrich's service, even in the absence of any evidence that he personally committed atrocities against these individuals, qualifies as 'advocating or assisting in persecution.'" *United States v. Friedrich*, 305 F. Supp. 2d at 1107 (citing *United States v. Szehinskyj*, 277 F.3d 331, 339 (3d Cir. 2002)).

Similarly, courts across the country have granted summary judgment on denaturalization involving concentration camp guards based upon the DPA, the RRA and on the Holtzman Amendment. *See e.g.,United States v. Breyer*, 41 F.3d 884, 888 (3d Cir. 1994)(Breyer was excluded under the DPA from obtaining a visa because of his SS Totenkopf guard service at Buchenwald and Auschwitz); *United States v. Negele*, 222 F.3d 443, 447-448 (8th Cir. 2000)(service in Waffen SS Death's Head guard unit at Sachsenhausen concentration camp and Theresienstadt internment camp, was membership and participation in movement hostile to United States within meaning of DPA); *Tittjung v. Reno*, 199 F.3d 393, 398 (7th Cir. 1999) (concluding service as an armed SS Death's Head Battalion concentration camp guard constituted assisting in persecution within the meaning of the Holtzman Amendment); *Hammer v. INS*, 195 F.3d 836, 843 (6th Cir. 1999) (upholding a removal order against a former SS Death's Head Battalion guard under the Holtzman Amendment); *United States v. Schmidt*, 923 F.2d 1253, 1257 (7th Cir. 1991) (affirming order of denaturalization in case of armed guard in concentration camp and finding that such service was sufficient to establish that the guard "assisted in persecution" within the meaning of the DPA); *United States v. Hansl*, 364 F. Supp. 2d 966 (S. D. Iowa 2005)(ineligible to receive a visa to enter the United States under the RRA because of his personal conduct while serving in the Death's Head Guard Battalion); *United States v. Wasylyk*, 162 F. Supp. 2d 86, 93-94 (N. D. N.Y. 2001) (holding that armed guard of concentration camp assisted the enemy in the persecution of civilians and was, therefore, ineligible for a visa under the DPA, regardless of whether he personally injured or killed anyone); *United States v. Hutyrczyk*, 803 F. Supp. 1001, 1009-10 (D. N. J 1992) (summary judgment proper because concentration camp guard assisted in the persecution of the camp's Jewish inmates within  the meaning of the DPA).

In the instant action, the facts are undisputed, and similarly warrant summary judgment. Geiser admits that he served as an armed SS Death's Head guard at Sachsenhausen Concentration Camp for most of 1943.  It is undisputed that while on duty at Sachsenhausen,

Geiser guarded the camp's perimeter and was under standing orders to shoot any prisoner attempting to escape.  Geiser admits that he escorted forced laborers to and from work sites and guarded prisoners from the watch tower.  It is also admitted that Geiser served as an armed guard at both Buchenwald Concentration Camp and its Arolsen subcamp from November 1944 until April of 1945.  At Buchenwald and Arolsen, Geiser was armed and under orders to shoot anyone attempting to escape.  Geiser also escorted prisoners from Buchenwald to Arolsen, and later evacuated prisoners from Arolsen back to Buchenwald as Allied forces approached and the Germans decided to evacuate the subcamp.

Based upon these undisputed facts, as well as Geiser's admissions and sworn deposition testimony, the Court finds that he personally assisted in the persecution of people because of race, religion or national origin.  Therefore, Geiser was statutorily ineligible to receive an immigrant visa under the RRA.  Because an individual may not be naturalized unless he has first been lawfully admitted for permanent residence, citizenship founded on an invalid visa amounts to illegal procurement. *See* 8 U.S.C. §§ 1427(a)(1). Pursuant to 8 U.S.C. § 1451(a), Geiser's citizenship must be revoked as a matter of law.


**V.    CONCLUSION**

Based on the foregoing, there is no genuine issue of material fact, and the Government is entitled to judgment as a matter of law. Therefore, the motion for summary judgment filed by the Government shall be granted. Geiser's motion for summary judgment must be denied. Pursuant to 8 U.S.C. § 1451(a), Geiser's citizenship must be revoked as a matter of law.

An appropriate Order will follow.


s/ David Stewart Cercone
David Stewart Cercone,
United States District Judge


13

cc:    Albert W. Schollaert, AUSA
       Jessica Lieber Smolar, AUSA

       Stephen Paskey, Esquire
       Adam S. Fels, Esquire
       Office of Special Investigations
       U. S. Department of Justice
       Suite 200, John C. Keeney Building
       10th & Constitution Avenue, N.W.
       Washington, DC 20530

       Jay K. Reisinger, Esquire
       Samuel J. Reich, Esquire
       Suite 1000 - Koppers Building
       436 Seventh Avenue
       Pittsburgh, PA 15219

       Adrian N. Roe, Esquire
       Watkins, Dulac & Roe, .C.
       Two Gateway Center
       603 Stanwix Street - 17 East
       Pittsburgh, PA 15222